UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


IN RE:                        )
                              )     Case No. 01-MDL-00875-CVLO
ASBESTOS PRODUCTS             )
LIABILITY LITIGATION          )     Philadelphia, PA
                              )     March 26, 2012
                              )     4:01 p.m.
---------------------------


TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiffs:        R. MATTHEW SCHROEDER, ESQUIRE
                           RONALD ARCHER, ESQUIRE
                           CASCINO VAUGHAN LAW OFFICES, LTD.
                           220 South Ashland Avenue
                           Chicago, Illinois  60607


For the Defendants,        MICHAEL W. DRUMKE, ESQUIRE
Georgia-Pacific:           KAITLYN CHENEVERT, ESQUIRE
                           SWANSON, MARTIN & BELL, LLP
                           330 North Wabash, Ste. 330
                           Chicago, IL  60611


Audio Operator:            CHRISTINA FRANZESE


Transcribed by:            DIANA DOMAN TRANSCRIBING
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-0129
                           Phone:  (856) 435-7172
                           Fax:    (856) 435-7124
                           Email:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

Colloquy                                                              2

1          (The following telephone conference was heard at 4:01

2     p.m.)

3               THE COURT:  Good afternoon.  Judge Strawbridge.

4               MR. ARCHER:  Good afternoon, Judge.

5               THE COURT:  All right.  Sorry to hold you guys up.

6     And, I guess -- I'm not sure what happened but, anyway, the

7     call didn't go earlier as we had hoped that it would.

8               MR. DRUMKE:  No, that's --

9               THE COURT:  I'm sorry, Mr. Drumke, was that you?

10              MR. DRUMKE:  Yes, Your Honor.  I'm sorry about that.

11    We -- we thought we had it clear with Pohlman that the call

12    was scheduled for 11:30 central, 12:30 eastern.  And, they

13    took it as 12:30 central, so the line wasn't set up properly

14    and we apologize.

15              THE COURT:  Okay.  No problem.  Frankly, I'm

16    surprised we haven't had more problems like that with the time

17    difference.  Okay.

18              MR. DRUMKE:  I am, too.

19              THE COURT:  All right.  So we have Bob McCoy is on

20    from plaintiffs, Mike Drumke for the GP.  Oh, Mr. -

21              MR. SCHROEDER:  Your Honor, this is Matthew

22    Schroeder.  Mr. McCoy was unable to make it because he's

23    traveling to Philadelphia at the moment.

24              THE COURT:  All right.  I did -- I guess I did -- I

25    did -- I'm sorry, Matt, your -- I guess your voice came

1   through a little bit like Mr. McCoy's voice, for better or for
2   worse.  And, Mr. Archer is also on, I understand, right?
3                  MR. ARCHER:  That's correct, Judge.
4                  THE COURT:  All right.  And --
5                  MR. ARCHER:  Yes, Your Honor.
6                  THE COURT:  And, Ms. Chenevert and Mr. Drumke.
7   Okay.  Okay.  I've been through these papers.  And, I have
8   gone back and looked at the protocol.  And, I -- while I
9   understand -- someone's doing some heavy breathing here.  If
10  we could try to eliminate that, whoever that is.  And, I think
11  that -- I think I have a reasonably good understanding of
12  this.  While there are apparently some differences between the
13  situation with respect to Mr. Cooper and Mr. Malone, I
14  understand it to be the case that there had been previous
15  deposition notices where Georgia -- as to both of them, where
16  Georgia-Pacific had been named as a party.
17                 I thought it was Mr. Malone's situation, I think,
18  from what I got from Mr. Drumke's papers, on two occasions
19  when Georgia-Pacific was provided in the notice, and then two
20  occasions when Georgia-Pacific was not provided in the notice,
21  if I have that right.  And, with respect to Mr. - Mr. Cooper,
22  I understand there was at least one notice when Mr. - when
23  Georgia-Pacific had been indicated in the notice, and then one
24  occasion -- at least one occasion, maybe more, when he had not
25  been provided in the notice.

1              And, I guess what's critical, it seems to me, for

2     the analysis, is that there had been at least a previous

3     notice when Georgia-Pacific had been -- a previous deposition

4     notice served when Georgia-Pacific had been listed, and under

5     the protocol, would put them on notice that there was a

6     potential for their client to be identified.  And, then on a

7     subsequent notice they were taken off, leaving Georgia-Pacific

8     to reasonably conclude, as per the protocol, that their party

9     was not going to be identified.

10             So understanding that I'm less than 100 percent

11    precise on the key issues of prior notification and then

12    subsequent -- a subsequent notice when Georgia-Pacific was not

13    listed, do I have that right?  Mr. Drumke?

14             MR. DRUMKE:  Yes, Your Honor.

15             THE COURT:  Okay.  So I guess the first question is

16    of Mr. Archer or Mr. Schroeder, whomever will answer on behalf

17    of the plaintiffs, what was it that brought about the

18    notification or the inclusion of Georgia-Pacific in the

19    notification on the earlier notices that were sent out?

20             MR. ARCHER:  Ron Archer, Your Honor.  Our

21    understanding was that we were -- at some point we were

22    putting everybody on the notices because we wanted to include

23    everybody, in case the guy had -- in case the witness had ID.

24    But some clients we were -- I was told, and other around here

25    were told that if -- if defendants are on the notice, but the

1  witness doesn't have the product identification, we can get

2  sanctioned for that.

3        So I think what happened here is we didn't have any

4  indication that he absolutely had Georgia-Pacific ID.  And --

5  just like my declaration says.  So we didn't include it, to be

6  safe, because we don't want to get sanctioned.  So we wanted

7  to make sure, you know, okay, this guy can talk about whatever

8  turbine exposure he had, and he can talk about this and that

9  or whatever, and leave everybody else out, because we just

10  don't know what he's going to be able to say about those

11  defendants, so we don't get sanctioned.  That was the --

12  that's the rationale behind switching them up and -- and

13  taking them -- taking Georgia-Pacific off the -- the notices.

14        THE COURT:  Were the earlier notices -- were not the

15  earlier notices -- at least one of the earlier notices

16  provided prior -- provided after the acceptance and the

17  adoption and the ordering of the protocol to be applicable to

18  this procedure?

19        MR. ARCHER:  Now --

20        UNIDENTIFIED SPEAKER:  I believe they all were, Your

21  Honor.

22        THE COURT:  Yes, that's my recollection, but I

23  wanted to hear from Mr. Archer about this.

24        MR. ARCHER:  I -- I really didn't catch everything

25  you were saying.  There was a -- a couple words cut out.

1     THE COURT:  What I'm saying is that the deposition

2     protocol -- you're familiar with the deposition protocol, Mr.

3     Archer?

4     MR. ARCHER:  Yes, Your Honor.

5     THE COURT:  Okay.  Now, that deposition protocol,

6     I'm just trying to get Lauren to check the precise date of it,

7     but that was a deposition protocol that I believe was agreed

8     to -- I know it was under discussion for some time with the --

9     with the parties, but I believe it was ultimately agreed to

10    sometime in September or October at the latest.  And, maybe

11    Mr. Drumke, if you have more precise information about that,

12    it might be helpful.

13    MR. DRUMKE:  Your Honor -- Your Honor, I actually

14    think it was late July.

15    THE COURT:  Okay.

16    UNIDENTIFIED SPEAKER:  It might have been updated.

17    THE COURT:  Yes.  And, then I think Joel has

18    mentioned -- well, Joel is mentioning to me he thought there

19    might have been some update, but you -- the impact of my

20    comment, Mr. Archer, would be that I would have thought -- Mr.

21    Drumke asserts that it is the case that the deposition

22    protocol would have been in place at the time you sent out the

23    earlier notices, which would -- which would have meant that

24    you wouldn't -- should not have been sending out notices, even

25    your -- the earlier notices you sent out with Georgia-Pacific

1    on it.  Can you comment on that?

2              MR. ARCHER:  Like I said, I -- I understand that,

3    and that's what I -- happened if we were following the

4    absolute letter of it.  But then I think there was a comment

5    by the Court at some point.  I'm saying, you know, if you --

6    you have ID -- or if you don't have any ID out of the

7    witnesses and -- and you have defendants on there that the guy

8    doesn't know anything about, and you -- you put them on the

9    notice that we can get -- we can get sanctioned for that.

10         And, I -- I think that was a -- just a hearing at some

11   point that you had.  It was -- it wasn't something as part of

12   an order.  I thought about a change and how -- how we were

13   doing -- how -- how we do and have done the deposition

14   notices, that's -- that was the -- that's my recollection of

15   why we --

16              THE COURT:  Why you what?

17              UNIDENTIFIED SPEAKER:  You what?

18              MR. ARCHER:  Why we started doing the notices a

19   little bit differently and just including what we -- what we

20   knew the guy had to say about certain defendants.

21              THE COURT:  All right.  Well -- well, the -- the

22   deposition protocol was something that was negotiated pretty

23   rigorously between the parties, as I recall it, generally

24   during the summer of 2011.  I think we had even entered an

25   order in late June 2011, requiring counsel -- and I -- my

1    recollection is Mr. Drumke and Mr. McCoy were the key people

2    on this -- to work through all these details, in order to

3    accommodate the needs of the parties, the reasonableness of

4    the proceedings when you had so many defendants that were

5    potentially at risk and -- and imposing upon the plaintiff the

6    obligation to undertake some due diligence with respect to who

7    the -- who your own client was expected -- what products it

8    was expected to identify.  And, as Mr. Drumke has pointed out,

9    that is certainly a requirement that one would have expected

10   under Rule 11 as a start.

11           So I don't know if you want to think about this any

12   differently, but it sounds like when -- if you did, in fact,

13   send out notices -- and I don't -- I don't have the dates, but

14   they're of record, and I think they're in Mr. Drumke's papers

15   with -- with exhibits attached.  If you did send out

16   deposition notices with Georgia-Pacific on it, when you didn't

17   have the specific information about Georgia-Pacific having

18   been someone that your client was going to identify, which is,

19   I think, what you indicated to me just now, that would have

20   been in violation of the protocol.  Do you understand what I'm

21   saying, Mr. Archer?

22           MR. ARCHER:  Yes, I do.

23           THE COURT:  Do you accept -- do you accept --

24           MR. ARCHER:  We -- that's what we tried to -- what

25   we're -- as we're going along and doing this whole process of

1    doing these depositions -- I have to say --

2          THE COURT:  I'm not sure that you're maybe not close

3    enough to the phone or something, but you're -- you are

4    kicking out a little bit.

5          MR. ARCHER:  Sorry.  What did -- did you miss?

6          MR. DRUMKE:  Most of it.

7          MR. ARCHER:  Somebody's doing that heavy breathing

8    again.

9          THE COURT:  Yeah.  Okay.  So go -- so go ahead.

10   Repeat your answer, please.

11         MR. ARCHER:  Yeah, the -- what -- what we're --

12   we're trying to do is -- I mean, it's kind of a learning

13   process and a work in progress.  You know, we -- not trying to

14   jam anybody.  At first it was -- and I don't know who made

15   this, you know, a -- a -- sort of a -- the way we do things

16   around here is, you know, if -- if there's any -- any kind of

17   idea -- if the -- if the defendant's in the case, we put them

18   on -- on the notice.  But then as we've moved along, you know,

19   it just -- we --

20         THE COURT:  Are you there?

21         MR. ARCHER:  Yeah, yeah, I'm -- I'm thinking.

22         THE COURT:  Oh.

23         MR. ARCHER:  We're -- sorry, did you -- were you

24   saying more?

25         THE COURT:  I was ask -- I -- I have not heard you

1    for about the last 30 seconds.

2              MR. ARCHER:  Okay.

3              THE COURT:  And, I didn't know whether you speak --

4              MR. ARCHER:  What I'm saying is that we're -- it's a

5    -- sort of a work in progress.  We started doing these things

6    about six months or more ago.  And, if you look at all the

7    notices, most of them had just about everybody in the case on

8    the notices.  And, for whatever reason, that was the way we

9    were doing them.  I didn't make that policy, so I can't really

10   speak to why it was okay or it wasn't okay.

11             THE COURT:  All right.  Okay.  Well, I -- I -- I

12   hear you.  Now, I would -- I'm interested in this.  As to the

13   -- Mr. Drumke, as to the -- maybe I got it drilled down now as

14   to the specifics, but as to the deposition notices that were

15   sent out in -- in Cooper, for example -- and my -- that's --

16   that's the one that I just had a little bit more specific

17   information.  I understood two notices where Georgia-Pacific

18   was identified and two notices where they were not.  As to the

19   first two notices, did -- did any part of a deposition, in

20   fact, take place?

21             MR. ARCHER:  No.

22             MR. DRUMKE:  I think that's right, Your Honor.

23             THE COURT:  They did not as to the --

24             MR. ARCHER:  No, we had to continue those

25   depositions for different reasons --

```
 1              THE COURT:  Okay.

 2              MR. ARCHER:  -- both times.

 3              THE COURT:  All right.  Fine.  Now, as to the -- as

 4   to the first -- as to the -- I guess it would be the third

 5   deposition notice, when Georgia-Pacific was taken off, as to

 6   that one, did a deposition or any part of a deposition take

 7   place?

 8              MR. ARCHER:  A deposition did take place and -- and

 9   it concluded.

10              THE COURT:  Is that your understanding, Mr. Drumke?

11              MR. DRUMKE:  For Mr. - Mr. Cooper, I think that's

12   right.

13              THE COURT:  Okay.

14              MR. ARCHER:  Oh, no, no, no.

15              MR. DRUMKE:  Your Honor, I don't want to say to what

16   -- what concluded and what didn't; we weren't there,

17   obviously.

18              THE COURT:  Well, okay.

19              MR. ARCHER:  I'm sorry, what -- I thought we were

20   talking about Clifford Malone.

21              THE COURT:  No.

22              MR. ARCHER:  Clifford Malone is one where we had two

23   -- two prior deposition notices, and we had to continue his

24   deposition a couple times --

25              THE COURT:  Yes.
```

1          MR. ARCHER:  -- for different reasons.  Is that what

2   your understanding is?

3          THE COURT:  Yes.  I'm sorry, Malone is the one I

4   meant.  I think perhaps I misspoke when I said Cooper.  Malone

5   -- yes, Malone is the one where I understood earlier -- I

6   articulated earlier, and I thought Mr. Drumke understood it

7   was consistent with his understanding that there were two

8   times Georgia-Pacific was on the notice, two times Georgia-

9   Pacific was not on the notice, and it was the second time that

10  Georgia-Pacific was not on the notice that a deposition

11  actually took place.  And, there was evidence elicited about

12  Georgia-Pacific.  That's my understanding as to Malone.  Is

13  that correct, Mr. Drumke, from your understanding?

14         MR. DRUMKE:  Kaitlyn will correct me if I'm wrong,

15  but I think that's correct.

16         THE COURT:  All right.  Mr. - Mr. Archer, is that

17  correct from your understanding?

18         MR. ARCHER:  Yes, that's my understanding to

19  depositions concluded.  Also, Cooper's deposition did not

20  conclude.

21         THE COURT:  Okay.  So I'm going to make an

22  assumption that between the time of these various depositions

23  your office -- and I'm not going to ask you the substance of

24  it, but your office must have had some contact with Mr.

25  Malone, is that -- would that have been right?

1          MR. ARCHER:  Say more.  I'm sorry.

2          THE COURT:  Your office must have had some contact

3    with Mr. Malone during the time period of these several

4    deposition notices being sent out?

5          MR. ARCHER:  Actually what happened with Malone was

6    we would have to go through his daughter to -- for scheduling.

7    He's pretty -- pretty sick.  He's on dialysis three times a

8    week.  He doesn't hear very well, so it's hard to talk to him

9    on the phone.

10         THE COURT:  All right.  I got --

11         MR. ARCHER:  But --

12         THE COURT:  I got -- I got all that.  But just

13   looking trying to get a answer to a simple question.  Whether

14   it was through his daughter or otherwise, you did have contact

15   with him, either directly or indirectly, through his daughter,

16   is that right?

17         MR. ARCHER:  Yeah.  For scheduling purposes, yes.

18         THE COURT:  Right.  Are you able to tell me -- are

19   you able to tell me what brought about the change from your

20   office's standpoint as to how on deposition notice number two

21   Mr. - Georgia-Pacific was notified -- was noticed, but on

22   deposition notice number three, Georgia-Pacific was not

23   noticed?  Do you know the specific answer to that question in

24   this case as to --

25         MR. ARCHER:  Yes.

1           THE COURT:  -- as to Malone?

2           MR. ARCHER:  I'm sorry, Your Honor, I interrupted

3    you.  What my understanding was is that we had to be more

4    precise with our PID as far as what these guys were expected

5    to testify to.  And, at that point we -- we started with --

6    our policy was to put in the defendants know he can talk about

7    for sure.  So -- but at that point we changed -- we -- we took

8    the -- took Georgia-Pacific off of the notice and put in there

9    we knew he was going to talk about.

10          And, of course, the problem was I hadn't talked to

11   him in person.  And -- and that mean, you know, I was kind of

12   going in blind a little bit.  That's why he gave -- when I

13   talked to him, I actually found out that he had Maremont and

14   Georgia-Pacific identification testimony.  And, unfortunately,

15   that's just the way that -- that turned out to be.

16          THE COURT:  Okay.  Now, Mr. Archer did -- did you --

17   when you first learned in the conversation with Mr. Malone, I

18   believe you said in the declaration that you submitted to us

19   as to -- and I'm talking about Mr. Malone now.  I believe you

20   said that the evening before the deposition is when you first

21   learned that Mr. Malone had information with respect to

22   Georgia-Pacific.  So my question to you is, did you, or did

23   anybody associated with your work in connection with this

24   deposition, make any effort to try to notify Georgia-Pacific

25   before the deposition as to what you had learned from Mr.

1    Malone?

2             MR. ARCHER:  I did not try to do anything.  At that

3    point when I left his house, it was probably about 9:00

4    o'clock in the evening.  It was -- I -- what I figured was it

5    was just kind of late to do anything at that point.  I -- and

6    what -- what I -- my understanding was that the protocol is

7    it's the -- he's going to give test -- about -- that's not

8    there -- have a chance eventually to -- to cross him.

9             What I've -- and what I should have done, also, Your

10   Honor, by the way, is -- and I'm -- and I'm offering this

11   right now -- that all -- all -- all motions to strike and

12   objections are preserved as far as Georgia-Pacific for the --

13   for any of the testimony that -- that Clifford Malone has

14   already given.  I think that's fair.  And, I -- I -- and I'm

15   saying that right now.

16            THE COURT:  Okay.  Now, did you on the day of the

17   deposition with whatever other counsel -- defense counsel were

18   present, which is a matter of record obviously, but not

19   Georgia-Pacific -- did you, or did you ask anybody in your

20   office to at least advise Georgia-Pacific as to the

21   circumstance that you had just become aware of the night

22   before?

23            MR. ARCHER:  No.

24            THE COURT:  Was -- the first time that you provided

25   information to Georgia-Pacific was -- was that when you

1    provided the second -- the next deposition notice?

2            MR. ARCHER:  I -- I think we missed what you're

3    saying.

4            THE COURT:  When was the first time you advised

5    Georgia-Pacific that you had information that Mr. Malone was

6    -- had a reason to believe to believe that he was exposed to

7    general -- to Georgia-Pacific products?

8            MR. ARCHER:  That was when we gave him notice of the

9    -- of the new deposition.

10           THE COURT:  Okay.  And, how many days was that after

11   you had received information -- the information from Mr.

12   Malone with respect to Georgia-Pacific products?

13           MR. ARCHER:  That was about 14 days after when we

14   re-noticed -- or we noticed his new deposition for Georgia-

15   Pacific.

16           THE COURT:  Okay.  Now, with respect to -- with

17   respect to Mr. Cooper, Mr. Drumke, I'm going to need some help

18   from you about this.  My -- my -- I'm -- I'm unclear about the

19   specifics with respect to Mr. Cooper in terms of the first

20   time the Georgia-Pacific product was identified by that

21   particular witness was at a deposition where your client had

22   not been noticed, is that right?

23           MR. DRUMKE:  That's our understanding, Your Honor,

24   that's correct.  That's -- that's all we know.

25           THE COURT:  Okay.  And, there -- when was it you

1    first learned from anybody associated with the plaintiff that

2    Mr. Cooper had identified a Georgia-Pacific product?

3              MR. DRUMKE:  When we -- well, I mean, we still don't

4    know for sure.  What we -- what we got notice of that we were

5    supposed to show up for another deposition.  Apparently he was

6    going to be able to identify us.

7              THE COURT:  And, that was how many --

8              MR. DRUMKE:  We never -- we've never gotten a phone

9    call or a letter saying, oh, by the way --

10             THE COURT:  Yes.

11             MR. DRUMKE:  -- this is what happened.

12             THE COURT:  But how long was that when the second --

13   the next notice came out on Mr. Cooper's deposition?

14             MR. DRUMKE:  Kaitlyn, can you --

15             MS. CHENEVERT:  Yeah, the second -- the second

16   notice for Mr. Cooper's deposition came out on March 16th.

17             THE COURT:  And, how -- and how many days was that

18   after the first time that he offered evidence with respect to

19   Georgia-Pacific at the earlier deposition?

20             MS. CHENEVERT:  The -- the first day of the

21   deposition took place on January 26th.

22             THE COURT:  All right.  So it's a period of --

23             MS. CHENEVERT:  And, then the --

24             THE COURT:  All right.  So --

25             MS. CHENEVERT:  -- the deposition notice went out on

1   March 16th.

2           THE COURT:  All right.  So it's a period of -- a

3   period of almost two months, is that right?

4           MS. CHENEVERT:  Right.

5           THE COURT:  Okay.  Now, Mr. Archer, do you have any

6   explanation with respect to -- to that?  Or do you -- do you

7   -- are the statements that they've made factually correct as

8   you understand?  Let me ask you first of all, with respect to

9   Mr. Cooper?

10          MR. ARCHER:  I want to make this -- Mr. Cooper's

11  depositions did not conclude -- end of the -- at the end of

12  the day what I said, and it's on page 66, is we're going to --

13  this deposition to a later time.  It's not feasible to finish

14  today.  Jack McCants was there.  So I said, Jack and I have

15  the sense that it's probably not going to finish today, and

16  it's more feasible to bring you -- you back at a later time

17  because then we'll be able to invite Georgia-Pacific to this,

18  also.  Okay?  I'm going to walk you out of here.  And, that's

19  when I walked Mr. Cooper to his -- his car.

20          So that deposition never concluded.  And, the -- and

21  the protocol specifically mentioned conclusion of the

22  deposition if they're written.

23          THE COURT:  Okay.  Let me just ask you some facts,

24  and then I'll talk to you about the protocol.  Because I am

25  interested in that -- in that topic as well.  But did -- I

1   mean, I understand what you said on the record.  Georgia-

2   Pacific was not present when that was said.  That is correct

3   obviously, is it not?

4           MR. ARCHER:  Yeah, they weren't there.

5           THE COURT:  Okay.

6           MR. ARCHER:  And, I just -- well, go ahead.

7           THE COURT:  Did you just -- did you -- did you,

8   yourself, or anybody from Cascino Vaughan provide any

9   notification to Mr. Drumke's firm -- Ms. Chenevert's firm

10  prior to the next deposition notice some 45 or 50 days later

11  about the witness having identified a Georgia-Pacific product?

12          MR. ARCHER:  I am not aware of any.  I -- I didn't

13  have any -- any conversations with anybody.

14          THE COURT:  All right.  So as far as you know from

15  -- from -- from the plaintiff's side, as far as you know that

16  was not done, is that -- is that fair to say?

17          MR. ARCHER:  Yes.  But I didn't think we had to.  I

18  didn't think that was -- that was something we were required

19  to do.

20          THE COURT:  All right.  Mr. Drumke, do you want to

21  address this question?  Or Ms. Chenevert?

22          MR. DRUMKE:  Your Honor, we -- we obvious -- we did

23  not get any further notice.  We did not get any phone calls or

24  letters obviously and the first indication we had was new

25  deposition notice.  You know, our -- my negotiations with Mr.

1   McCoy, and I think the Court is aware of this, with respect to

2   protocol was the -- the 14-day notice provision was -- and the

3   listing of who's going to be identified was a requirement so

4   that the plaintiffs would actually talk to their clients at

5   least 14 days in advance, figure out who would be implicated

6   in the deposition, and then draft their notices accordingly.

7           And, what is apparent and what is made clear by Mr.

8   Archer's declaration is nothing of the sort happened.  And,

9   that they just issued the notices without regard to having

10  talked to their clients.  And, then the night before they may

11  or may not figure out that the notice is -- is correct.  And,

12  that's obviously not in the spirit of the protocol.

13          You know, Georgia-Pacific's a named defendant in

14  both these gentlemen's cases.  It surprises me that nobody was

15  able to spear out prior to the deposition notices going out,

16  or the last deposition notice going out, that Georgia-Pacific

17  wouldn't be implicated or wasn't a subject of the case.

18          THE COURT:  Yes.

19          MR. DRUMKE:  And, I just find that hard to believe.

20          THE COURT:  Okay.  So -- but the -- the question

21  with respect to the 14 days and the implications of that,

22  depending upon whether or not there is any unexpected

23  testimony, which is a -- a phrase that I think you highlighted

24  in your papers, frankly, as I look at the protocol, which was

25  negotiated -- rigorously negotiated, as I would understand it,

1    between you and Mr. McCoy, at least I know it took a long time

2    to get this finally ironed out, with a lot of pushing from our

3    end here, was that -- and I'm reading the applicable part of

4    it -- is, "Any defendant not listed in the notice of

5    depositions implicated in a deposition, and any party to the

6    notice, which is to use the testimony against the unlisted

7    defendant, that party seeking to use the testimony shall

8    provide notice within 14 days of the date of the deposition to

9    the unlisted defendant and schedule a time to resume the

10   deposition for purposes only of the testimony relating to the

11   unlisted defendant."

12          I think that's the sentence I -- I hear it as that's

13   the sentence to which Mr. Archer takes refuge with respect --

14   and based upon what I would -- hang on just a second.  But

15   then the next sentence says -- the next sentence addresses a

16   remedy.  And, the remedy and what is addressed in the next

17   sentence is, "Failure to provide such notice within 14 days of

18   the conclusion of the deposition shall constitute a waiver of

19   any rights by the parties to use the deposition against the

20   unlisted defendants."

21          Now, I'm not saying that's an exclusive remedy, but

22   that is a remedy that's provided for a protocol.  And,

23   obviously, otherwise we're all subject to Rule 37 and the

24   remedies in Rule 37.  But I think that one of the -- one of

25   the bits of relief, I think, that you ask for goes to whether

1    or not they should be precluded from using any of that

2    testimony against Georgia-Pacific.  And, Mr. Archer seeks

3    refuge in the phrase which makes reference to 14 days of the

4    conclusion of the deposition.

5            And, frankly, I think -- and I'm going to -- as part

6    of whatever it is that we end up doing here, I'm going to do

7    something which would modify that -- the -- the disclosure --

8    the -- the deposition protocol to make it clear that the

9    business with respect to this notice of any intent to utilize

10   the information from a deposition as to information about a

11   party who was not provided with notice to that particular

12   deposition to be within 14 days from the point in time at

13   which the -- the party who was not at the deposition because

14   they had not been provided the notice of the deposition, 14

15   days after that event happened.

16           I don't know why it is that the language about that

17   being done at the conclusion of the deposition in the second

18   applicable sentence -- and I'm on paragraph six of the

19   protocol -- reads the way it is because it strikes me there's

20   a bit -- it's a bit ambiguous.

21           MR. DRUMKE:  Your Honor, you -- you understand that

22   we're negotiating back and forth, but I think clearly, you

23   know, in terms of relief, striking -- not preserving some

24   motion to strike, but striking the deposition testimony

25   regarding my client in its entirety is, at a minimum, what's

1    required.

2         The second point is that I think, quite frankly, had

3    I been in Mr. Archer's shoes, and had I been in front of Judge

4    Strawbridge, I would have expected that had my client told me

5    I was going to have testimony about -- or he was going to have

6    testimony about a defendant not named in the notice, I would

7    have rescheduled the deposition and not proceeded with it,

8    asked questions unfettered, leading questions.  Starting out

9    both depositions with leading questions about that defendant.

10   And, then followed up whenever it was convenient to me to do

11   so.  I just don't think that's good faith.

12        THE COURT:  Well, I hear you, and I'm not going to

13   quarrel with you about parts of this, not all of which you've

14   had to say.  But I have been through the relevant parts of the

15   depositions and I think that Georgia-Pacific was raised as a

16   result of what was arguably an open-ended question.  But you

17   know, there is obviously followup and some focus upon Georgia-

18   Pacific at that point.  But that could be just a matter of

19   some different -- some different interpretation.  But --

20        MR. DRUMKE:  Your Honor -- and, Your Honor, in terms

21   of the unexpected nature of the testimony, I really do believe

22   that, you know, that was contemplated where there were

23   coworkers being involved.  Perhaps there was a subpoena maybe.

24   We might not know what they had to say.  And, you know -- or

25   something changed or somebody had a memory.  Not where

1    somebody figured out the night before that testimony was going

2    to happen.

3            THE COURT:  Yes.  All right.  Okay.  Well, Mr.

4    Archer, is there anything further you want to add to this?  I

5    mean, I went through the -- what I consider to be the two

6    relevant sentences as to the protocol, and I was referring to

7    paragraph six of the protocol.  You've heard my comments and

8    Mr. Drumke's comments about the implication of that.  Is there

9    anything further you want to add here?  I don't want to

10   foreclose you.

11           MR. ARCHER:  Yeah, sure, Your Honor.  And, thank

12   you.  I think the term "unexpected" -- interpret it as

13   narrowly as Mr. Drumke wants to.  It's not defined in the

14   protocol.  And, it doesn't say it's unexpected as to whom.  It

15   says just unexpected.  And, you know, when it -- when I find

16   something out from a witness the day before or the night

17   before, I think that's unexpected.  I'm -- my mission is just

18   to get out there -- testimony from these guys however I can,

19   if I can.  If I can't, then I don't.  And, that's just the way

20   it goes.

21           If you want -- and on another point, Your Honor, I

22   don't know which way you're leaning on this but -- when I

23   heard about all this is we did something wrong and you want to

24   -- us for some reason, and I think you can do that, you can

25   just strike all -- everybody's testimony, you know, Cooper's

1    and Malone's, and we'll put -- we'll put these guys up for

2    deposition again, and they can start with their cross-

3    examinations as if the deposition testimony never existed.

4              I think, though, under the letter of the protocol, I

5    think we followed it.  And, unfortunately, it does have

6    ambiguities in it.  And, that's -- and you know, part of

7    ambiguity creates lack of communication and communication

8    breakdown, which is -- I -- I'm just as much to blame as

9    anybody else.  I -- that if and when this happens again, which

10   it probably will in -- in this -- however long it will take to

11   do all these things.

12             I -- I think the thing to do is -- is, you know, for

13   me to get Mike's email and Ms. Chenevert's email, whoever I

14   need to get.  I don't have these people's emails.  I don't run

15   around emailing everybody.  There's a ton of defendants out

16   there, so I don't have everybody's emails.  But if I need to

17   do that, well, then I think that's fair, too.  I think it's

18   something that I -- that I'll consider in the future.  And, we

19   could avoid this kind of stuff if we can.

20             THE COURT:  Well, Mr. Archer, my -- we'll make a

21   determination based upon what we believe are the facts and

22   circumstances of this -- the -- and the facts and

23   circumstances are not really much in dispute.  There might be

24   some dispute with respect to the interpretation of the

25   protocol.  And -- but we'll make a determination --

1    determination is going to be based upon the -- the

2    responsibility that counsel has to opposing counsel, both

3    under the rules, both pursuant to the protocol.

4            And, also, the circumstance of, you know, one

5    particular counsel within a group of counsel in a particular

6    law firm is -- is a problem for the law firm to work out, not

7    the problem for the opposing party to work out, or a problem

8    for the Court to work out.  But I think I've heard enough of

9    this.  And, thank you, gentlemen, very much.  And, Ms.

10   Chenevert, thank you very much for your time.  And, we'll come

11   out with a determination about this in due course.

12           MR. DRUMKE:  Your Honor -- Your Honor, just -- just

13   for clarification, there are depositions noticed at the end of

14   this week.  So I don't know what the Court's timing is, or I

15   don't know if the Court thinks that those depositions should

16   be postponed, but it would probably be helpful to have some

17   indication --

18           THE COURT:  Are you talking about deposition --

19           MR. DRUMKE:  -- of that.

20           THE COURT:  Are you talking about depositions of

21   Malone and depositions of Cooper?

22           MR. DRUMKE:  Yes.  That's why -- that's why we --

23   this came in front of Your Honor so quickly was that these

24   depositions have been re-noticed I believe for the end of the

25   week, right, Kaitlyn?

1          MS. CHENEVERT:  Mr. Malone's deposition is set for

2     tomorrow, and Mr. Cooper's deposition is set for Thursday and

3     Friday of this week.

4          THE COURT:  All right.  Well, my judgment is that

5     those depositions will go forward.  But that doesn't mean to

6     say that I'm necessarily saying that they might subsequently

7     be quashed.  But they -- but as a pragmatic matter, the

8     depositions need to go forward.

9          MR. DRUMKE:  Okay.  Thank you, Your Honor.  I

10    appreciate that.

11         THE COURT:  Thank you.  Thank you very much, folks.

12         MS. CHENEVERT:  Thank you, Your Honor.

13         THE COURT:  Take care.

14        (Proceedings concluded at 4:38 p.m.)

15

16

17

18

19

20

21

22

23

24

# C E R T I F I C A T I O N

I, Brenda Boulden, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____        _____

BRENDA BOULDEN                          DATE

DIANA DOMAN TRANSCRIBING